Filed 9/25/23  P. v. Jones CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>KEVIN JONES,<br><br>    Defendant and Appellant. | B324257<br><br><br>(Los Angeles County<br>Super. Ct. No. NA003332) |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>RONALD WAYNE McCLAIN,<br><br>    Defendant and Appellant. | B318647 |

APPEALS from orders of the Superior Court of Los Angeles County, Chet L. Taylor and Laura L. Laesecke, Judges. Affirmed.

Law Office of Stein and Markus, Andrew M. Stein, Joseph A. Markus and Brentford Ferreira for Defendant and Appellant Kevin Jones.

Jonathan E. Demson, under appointment by the Court of Appeal, for Defendant and Appellant Ronald Wayne McClain.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill, Zee Rodriguez, Heidi Salerno and John Yang, Deputy Attorneys General, for Plaintiff and Respondent.

———————————

In 1990, following a jury trial, Kevin Jones, Ronald Wayne McClain, and McClain's brother, Randall McClain,[1] were convicted of the burglary and first degree murder of 80-year-old Esther Mae Allen.  Allen was found in her home the morning following the burglary, bludgeoned to death.  Jones, McClain, and Randall appealed, and we affirmed. (*People v. Jones et al.* (July 15, 1992, B055397) [nonpub. opn.] (*Jones I*).)

In 2020 Jones and McClain filed separate petitions for resentencing pursuant to Penal Code former section 1170.95 (now section 1172.6).[2]  Following briefing and evidentiary hearings, the superior courts (two different judges) denied the petitions.  The

_____

[1]     We refer to Randall McClain by his first name to avoid confusion.

[2]     Further statutory references are to the Penal Code.

courts found Jones and McClain could still be convicted of felony murder because the People proved beyond a reasonable doubt that they were major participants and acted with reckless indifference to human life under the factors articulated in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*), *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), and *In re Scoggins* (2020) 9 Cal.5th 667 (*Scoggins*).

On appeal, Jones and McClain contend there was insufficient evidence to support the superior courts' findings each was a major participant in the burglary and acted with reckless indifference to human life.[3] We affirm both orders.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *The Killing*[4]

In 1989 Allen lived in a two-bedroom, one-bathroom bungalow in Long Beach. According to Allen's daughter-in-law Jovita Allen (Jovita), the house had two back doors. One back door led to the laundry area, followed by the kitchen, and then the dining area of the living room. The other back door led directly to the living room. To the right of the living room was "a little tiny hallway" and Allen's bedroom. A second bedroom and a bathroom were to the left of the living room.

---

[3] We consider the appeals in *People v. Jones* (B324257) and *People v. McClain* (B318647) together because they involve the same trial testimony.

[4] The facts are taken from the testimony at the joint trial of Jones, McClain, and Randall. The trial transcript was admitted into evidence at the evidentiary hearings.

Between 5:30 and 6:00 p.m. on October 26, 1989 Jovita left Allen's house. Shortly thereafter 20-year-old Jones, 20-year-old McClain, and 17-year-old Randall entered the house. The three men gained access through the kitchen window.

At approximately 7:30 a.m. the next morning Allen's daughter Joan Walsh went to Allen's house and entered through the front door using her key after Allen failed to answer her phone. Walsh walked through the living room toward the hall leading to Allen's bedroom. When Walsh reached the hallway, she saw blood "all over" on the hallway walls and Allen's bed, and she called the police. Allen's purse was under the door jamb of Allen's bedroom door, with the purse's contents scattered nearby. Allen's wallet was missing.

Shortly after the incident, Long Beach Police Sergeant James Bisetti and his partner, Long Beach Detective Bill Collette, arrived at Allen's house to investigate the crime. According to Sergeant Bisetti, Allen's house appeared "to be [an] early California style bungalow house" built in the mid- to late 1920s or early 1930s. Sergeant Bisetti observed the house had been ransacked with drawers open and items "removed from those drawers and strewn about the floors." He took a photograph of a black purse and its contents lying on the hallway floor just outside Allen's bedroom. He took a photograph inside Allen's bedroom showing a bloody sweatshirt and blood stains on a tennis shoe, a chest of drawers, and a bookcase. He also took a photograph depicting a heavily blood-stained pillow case and a bloody bedsheet on Allen's bed, a blood-stained pillow on the floor near the bed, "and numerous blood smears along the white wall window frame and Venetian blind." Two electrical cords had

4

been cut from kitchen appliances, and the ends of the cords were found in Allen's bedroom.

Allen died four days after the burglary. According to the coroner, Allen had multiple lacerations, skull fractures, and brain injuries to the right side of her head "consistent with blunt force [injuries]." The coroner opined Allen died from cranial cerebral trauma consistent with being struck with a crowbar "at least 10 times."

Long Beach Police Officer Logan Wren testified fingerprints were found at Allen's house and seven other burglarized Long Beach residences matching the fingerprints of Jones or McClain.[5] In April 1990 Officer Wren and Detective Collette interviewed Jones, McClain, and Randall separately after they each signed waivers of their *Miranda* rights.[6]

Jones stated that at approximately 8:00 p.m. on an unspecified date he, McClain, and Randall entered Allen's house through a window (or a back door that one of the three had opened) to commit a burglary. Jones walked through a laundry room and kitchen before entering the living room. Jones saw

---

[5] The amended information charged Jones, McClain, and Randall with the murder and burglary of Allen (§§ 187, subd. (a) (count 1); 459 (count 2)). The amended information also charged Jones with three additional burglaries, including of Kim Vo on November 21, 1989 (count 3), Olga Apponi on November 22, 1989 (count 4), and Jim Sciurda on January 9, 1990 (count 5). The amended information also charged McClain with five additional burglaries, including of H. Soukup on February 20, 1990 (count 6), A. Gallegos on February 27, 1990 (count 7), Sherri Gonser on March 2, 1990 (count 8), Janice Ede on March 5, 1990 (count 9), and Cynthia Burkart on February 26, 1990 (count 10).

[6] *Miranda v. Arizona* (1966) 284 U.S. 436, 444-445.

items against the wall and a piano in the living room.  He was in the living room when a purse was emptied out and money was taken from the purse.  In addition, electrical cords in the house were cut, and one of the three brought a crowbar into the house.  Jones admitted someone was in the house.  He could hear pounding sounds in the bedroom, and the person in the bedroom was beaten.

McClain said that at approximately 6:00 p.m. on an unspecified date just before Halloween, as it got dark outside, he, Jones, and Randall entered Allen's house to commit a burglary.  McClain did not wear gloves.  Wren described McClain's statement about the entry:  "Entry was made through the kitchen window.  The back door was open to enter.  A tire iron was taken into the house.  He walked through the laundry room and into the kitchen.  He thought somebody might have been in the house."  McClain was shown photographs of the interior of Allen's house, and he recognized the back door, laundry room, and living room.  When McClain was shown a photograph of Allen, he denied ever seeing her.  McClain took a videocassette recorder (VCR) that was on top of the television, and he later sold the VCR to a person at a bar.

Randall stated he entered the kitchen of Allen's house at approximately 6:00 p.m. on an unspecified date.  One of the group took a crowbar into the house.  Randall searched through the kitchen drawers, and some electrical cords in the house were cut.  He was not sure what rooms he had entered, but he denied entering any bedrooms.  He acknowledged that someone was home.  Randall heard six or seven pounding sounds, but he was not sure what caused the sounds.

B.      *The Verdicts and Sentencing*

The jury found Jones, McClain, and Randall guilty of first degree murder and the first degree burglary of Allen.  Further, the jury found Jones guilty of the first degree burglary of Vo, Apponi, and Sciurda, and McClain guilty of the first degree burglary of Gallegos, Gonser, Ede, and Burkart.  The trial court[7] sentenced Jones to an aggregate term of 34 years five months to life.  The court sentenced McClain to an aggregate term of 36 years four months to life.

C.      *Jones's Petition for Resentencing*

On December 18, 2020 Jones, represented by counsel, filed a petition for resentencing in which he argued he was eligible for relief under former section 1170.95 because he was convicted under the prior felony murder rule.  Jones argued under section 189, as amended by Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill 1437), he was not liable for Allen's murder because he was not the actual killer, did not act with the intent to kill, and was neither a major participant in the burglary nor acted with reckless indifference to human life.  Jones submitted with his petition among other documents the trial transcript, clerk's transcript from his appeal in *Jones I, supra*, B055397, and our opinion in *Jones I*.[8]  The People in their opposition argued

---

[7]      Judge Charles D. Sheldon presided over the trial and sentencing of Jones and McClain.  He passed away before Jones and McClaim filed their resentencing petitions.

[8]      Jones's sole contention in his prior appeal was that there was insufficient evidence to support his conviction of burglary of Sciurba's residence.  We rejected Jones's argument and affirmed the judgment.

Jones was ineligible for relief because he was a major participant who acted with reckless indifference to human life. In his reply, Jones disputed the *Banks/Clark* factors supported a finding of liability. On September 22, 2021 the superior court found Jones made a prima facie showing for relief and issued an order to show cause.

At the August 26, 2022 evidentiary hearing, the prosecutor argued Jones knew someone was home, a tire iron was taken into the bedroom, Jones heard pounding, and Jones knew a person was beaten, "yet [he] did nothing to stop it, if he was not the actual murderer." Further, Jones did nothing to minimize the harm to Allen. Jones's attorney argued Jones was 20 years old at the time of the crime and played no role in Allen's death. Jones was in the kitchen when he heard noises in the bedroom, and he could not have prevented McClain from beating Allen because he was in a separate room.

After hearing argument from counsel, the superior court[9] denied Jones's petition, acknowledging it had considered the trial testimony and non-hearsay preliminary hearing testimony. The court read into the record the CALCRIM No. 540B instruction that listed the *Banks/Clark* factors, and stated the "issue really comes down to whether or not Mr. Jones acted with reckless indifference to human life."

The superior court explained, "We know that Mr. Jones went to the victim's home with two other individuals. And sometimes, in some of the cases that we've come across, at least I've come across, youth can be a major issue. I don't think it applies here, in light of the fact that Randall McClain was, in

---

[9]     Judge Chet L. Taylor.

fact, a juvenile himself. And I believe at the time that this event took place, Mr. Jones was older tha[n] Randall McClain. . . . [I]t appears that Mr. Jones and Randall both pointed to Ronald McClain as having in his possession the crowbar that was used to beat the victim to death in this particular case. But we know that all of them went into that house together. And you can argue that although McClain had the crowbar in his possession, all three of them were in possession of that crowbar when they entered into that home. They knew exactly what they were doing. . . . I think the People make a good argument that it was planned, in light of the fact that the defendants waited until the victim's daughter left the house. . . . [T]hey became aware that there was someone inside. And I think that's important, because there was an opportunity for Mr. Jones to leave the residence at that time, knowing that someone was inside the home, and that one of them had in their possession a crowbar."

The court continued, "[Jones] might not have been in the bedroom, . . . but [he] was nearby. It was a bungalow-type style home, a small home. And according to the statements of [Jones], he was able to hear the pounding that was going on in the next room, as he stood in the kitchen while the victim was beaten by— I guess we can make an assumption, by perhaps Ronald McClain. We don't know for sure, but we know that he was inside the house, at a minimum when the beating took place. But when we add the fact that he did not do anything to mitigate the beating that was taking place, he continued with the others to finish the robbery of the house. They continued to grab the valuables, and they all left together."

The court distinguished the facts in *Scoggins* on the basis the defendant there returned to the scene to see if the victim was

still breathing, and he cooperated with the police.  By contrast, "[a]fter the beating took place, and according to the testimony of the daughter, there was blood everywhere.  Surely Mr. Jones should have seen the blood, and in addition to the pounding that he heard that was going on when the victim was beaten, he would have known that something serious or egregious was taking place in the bedroom involving an occupant of the house.  So for all those reasons, the petition is going to be denied."

Jones timely appealed.

D.    *McClain's Petition for Resentencing*

On October 20, 2020 McClain, representing himself, filed a form resentencing petition under former section 1170.95 in which he checked the boxes indicating he was convicted of murder and he "could not now be convicted of 1st or 2nd murder because of changes made to Penal Code §§ 188 and 189, effective January 1, 2019."  McClain also checked the boxes stating he was convicted of first degree felony murder; he was not the actual killer; and he did not, with the intent to kill, aid or abet the actual killer.  On November 18 the court appointed counsel for McClain.

In their opposition, the People argued Jones and Randall implicated McClain as Allen's actual killer.  The People asserted, "Jones and Randall told police they never saw the victim but both men believed someone was home and they heard pounding sounds coming from the bedroom."  (Boldface omitted.)  However, the People acknowledged "it is unknown which of the three men bludgeoned Ms. Allen to death."  The People further argued McClain was a major participant who acted with reckless disregard for Allen's life under the *Banks*/*Clark* and *Scoggins* factors.  The People attached to their opposition our opinion in

10

*Jones I, supra*, B055397,[10] the trial transcript, and the clerk's transcript. McClain did not file a reply.

On February 24, 2022 the superior court[11] found McClain had made a prima facie showing for relief and proceeded with the evidentiary hearing. McClain testified at the hearing. McClain admitted he was involved in a series of burglaries, including the burglary of Allen's house. Further, the Allen burglary was the only one he "did with other people." He denied ever going into Allen's bedroom or attacking, hurting, or killing Allen. Further, McClain did not hear anything that would have alerted him to an attack on Allen, nor did he see anyone kill Allen while he was in the house. He did not know who killed Allen. He testified the crowbar was used to break into the house, but he was not aware that electrical cords had been cut.

On cross-examination, McClain acknowledged he told police he recognized Allen's living room and dining room from the photographs, but he did not see Allen's bedroom. He knew someone was home because he heard Jones tell Randall that "someone was in the house." When asked why he did not leave upon learning someone was home, McClain responded, "I already had the VCR. When I heard someone was in the house, I left." At the time he heard that someone was home, Randall had the crowbar. McClain insisted he was in Allen's house for "maybe three to four minutes," which was "long enough to unhook the VCR." McClain admitted he told the police that Jones and

---

[10] In *Jones I, supra*, B055397, McClain principally challenged the failure to bifurcate at trial the additional burglary counts from the murder count. We found the counts were properly joined and affirmed the judgment.

[11] Judge Laura Laesecke.

11

Randall remained inside the house after he left.  But he did not know how long they stayed because he ran out of the house.  McClain had spoken with Randall during the past 33 years, and Randall continued to deny he killed Allen.  McClain had not spoken to Jones since the murder.

The prosecutor argued McClain, Randall, and Jones planned the burglary; the men brought a tire iron with them into the house; and they took time to obtain additional weapons by cutting electrical cords from kitchen appliances.  The prosecutor further argued based on Walsh's "testimony that there was blood everywhere" that it could be inferred "the murderer himself would have been covered in blood"; thus, "it would have been very easy for his compatriots to have seen the blood and recognize what happened were they not actually in the room when it happened."  The prosecutor maintained McClain lied when he denied going into Allen's bedroom because "[i]t wouldn't make any sense to go into a home and to burglarize a home and yet not go into any particular room."  And McClain could have intervened, called the police, or rendered aid, but "[h]e did nothing to alleviate or help" Allen.

McClain's attorney argued the crowbar was not a weapon, but rather, "it's brought as a means of entrance" into Allen's house.  Further, there was no evidence McClain cut the electrical cords or entered Allen's bedroom.  In addition, McClain was consistent in his statement to police and his testimony at the evidentiary hearing "that he took the VCR and left before anybody went into the bedroom."  McClain's attorney conceded the People had shown McClain was a major participant in the burglary, but they had not shown beyond a reasonable doubt that he acted with reckless disregard for human life.

After hearing argument from counsel, the superior court found beyond a reasonable doubt that McClain was a major participant who acted with reckless disregard for human life, and further, he was "directly involved in" the killing of Allen.[12]  The court explained, "[T]he court notes that the victim in this case is an 80-year-old woman, particularly vulnerable in her home. . . . There are lots of options that these defendants could have chosen to somehow minimize the damage or injuries to her, one of which would simply have been to close the door, tell her not to come out, do their burglary and leave.  They didn't do that.  Another option would have been to tie her up, put her in the bathroom to be able to ransack the bedroom.  They didn't do that.  They didn't just put a blindfold over her to keep her from being able to identify who the perpetrators are.  We're talking about someone who really posed absolutely no threat to these men. . . .  [W]hen [McClain] just took the stand here, he was, in my opinion, very cavalier and very arrogant and very reckless with his comments even here.  No remorse.  I just outlined what happened to this woman.  She was bludgeoned 10 times with a crowbar.  There is blood everywhere.  This woman died a horrific death.  Her daughter ended up walking in and seeing a horrific scene of her mother killed with a crowbar, and Mr. McClain didn't even indicate any slight bit of remorse, any sort of acknowledgment of what a terrible scene it is.  And the fact he is not willing to identify who is involved weighs heavily against him in this court's mind.  I know he knows.  And he is continuing to aid the other perpetrators by not saying who did it."

---

[12]     The court granted the People's request to receive into evidence the clerk's transcript, the reporter's transcripts, and the procedural history detailed in *Jones I, supra*, B055397.

The court reasoned that because the house was a small bungalow, McClain "could hear what was going on in this bedroom. . . . And to tell me that he doesn't know who did it, and he just popped in, took a VCR and left, I find his testimony to be incredible. I don't believe it. So I'm not using any of that, in essence to weigh in his favor." The court found McClain was a major participant because he was involved in the plan to burglarize the home, and further, given the time of the burglary (between 5:30 p.m. and 7:00 a.m.), McClain would have known someone was home. The court observed it was not necessary to use a tire iron to break into the home, so "it's logical that [McClain] would know that this is going to be used as a potential item for damage or being used as a weapon."[13]

The court added, "As to the danger factor, I believe all three defendants knew or should have known that someone was going to be at home. And even if [McClain] is saying he wasn't involved . . . in the murder, he certainly is hearing the bludgeoning that is going on with whoever is doing it in this very small house, very likely with the door being opened, and could have seen it occurring. . . . I think it's very clear that all three of

---

[13]    The trial court observed that McClain had committed "a pattern of burglaries with Mr. Jones. So the defendant lied to me on the stand." As McClain points out, the court was mistaken as to whether McClain and Jones had previously committed burglaries together. However, the court also found McClain's description of the burglary—how he took the VCR and fled without searching for other valuables—not credible. The court's error in stating McClain and Jones had committed burglaries together does not affect our analysis because the court separately considered whether McClain's testimony was credible, concluding it was not.

14

them were involved in ransacking this home and the murder occurs during the ransacking or during the burglary. . . . He obviously didn't do anything to intervene or help the victim, not that anybody could at that point.  He didn't call the police.  He would have clearly seen that there was blood all over the house. . . .  After the lethal force is used, he does nothing to help her."

The superior court found McClain acted with reckless indifference to human life under the *Clark* factors "for many of the same reasons" the court had articulated in finding McClain was a major participant, including that the tire iron was used as a shared weapon, it was not "logical" that McClain would not have entered the bedroom to steal the valuables, and given the duration of the burglary (including cutting the electrical cords and smearing blood everywhere) and the pounding sounds, McClain would have had time to "to reflect [and] to know what was going on.  He did nothing to reduce the harm."

McClain timely appealed.

## DISCUSSION

A.      *Senate Bill 1437 and Section 1172.6*

Senate Bill 1437 eliminated the natural and probable consequences doctrine as a basis for finding a defendant guilty of murder and significantly limited the scope of the felony-murder rule. (*People v. Strong* (2022) 13 Cal.5th 698, 707-708; *People v. Lewis* (2021) 11 Cal.5th 952, 957 (*Lewis*); *People v. Gentile* (2020) 10 Cal.5th 830, 842-843, 847-848; see *People v. Reyes* (2023) 14 Cal.5th 981, 984 (*Reyes*).)  Section 188, subdivision (a)(3), now prohibits imputing malice based solely on an individual's participation in a crime and requires proof of malice to convict a

15

principal of murder, except under the revised felony-murder rule as set forth in section 189, subdivision (e).  (*Reyes*, at p. 986; *Gentile*, at pp. 842-843.)  Section 189, subdivision (e), now requires the People to prove specific facts relating to the defendant's individual culpability:  The defendant was the actual killer (§ 189, subd. (e)(1)); although not the actual killer, the defendant, with the intent to kill, assisted in the commission of murder in the first degree (§ 189, subd. (e)(2)); or the defendant was a major participant in an underlying felony listed in section 189, subdivision (a), and acted with reckless indifference to human life as described in section 190.2, subdivision (d) (the felony-murder special-circumstance provision) (§ 189, subd. (e)(3)).  (See *Strong*, at p. 708.)  Senate Bill No. 775 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 551, § 2), effective January 1, 2022, expanded the scope of potential relief to apply Senate Bill 1437's ameliorative changes to individuals convicted of attempted murder and voluntary manslaughter.  (See § 1172.6, subd. (a).)

Senate Bill 1437 also provided a procedure (now codified in section 1172.6) for an individual convicted of felony murder or murder under the natural and probable consequences theory to petition the sentencing court to vacate the conviction and be resentenced on any remaining counts if the individual could not have been convicted of murder under Senate Bill 1437's changes to sections 188 and 189.  (*Lewis, supra*, 11 Cal.5th at p. 959; *People v. Gentile, supra*, 10 Cal.5th at p. 847.)

If the section 1172.6 petition contains all the required information, including a declaration by the petitioner that he or she is eligible for relief based on the requirements of subdivision (a), the sentencing court must appoint counsel to

16

represent the petitioner upon his or her request pursuant to section 1172.6, subdivision (b)(3).  Where a petitioner makes the requisite prima facie showing the petitioner falls within the provisions of section 1172.6 and is entitled to relief, the court must issue an order to show cause and hold an evidentiary hearing to determine whether to vacate the murder, attempted murder, or manslaughter conviction and resentence the petitioner on any remaining counts.  (§ 1172.6, subds. (c) & (d)(1).)

Section 1172.6, subdivision (d)(3), provides that at the evidentiary hearing, "the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019.  The admission of evidence in the hearing shall be governed by the Evidence Code, except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed."  Further, "[t]he prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens."  (§ 1172.6, subd. (d)(3).)  We review the superior court's decision to deny the petition after an evidentiary hearing for substantial evidence, provided the court understood the elements of the offense and applied the proper standard and burden of proof.  (*Reyes, supra*, 14 Cal.5th at p. 988; *People v. Vargas* (2022) 84 Cal.App.5th 943, 951.)

17

B.     *The Major Participant and Reckless Indifference Factors Under Banks, Clark, and Scoggins*

Senate Bill 1437 amended section 189 to limit the scope of the felony-murder rule, requiring the People to prove beyond a reasonable doubt that the defendant "was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." (§ 189, subd. (e)(3); see § 1170.95, subds. (a)(3) & (d)(3).) In *Banks*, the Supreme Court clarified the scope of section 190.2, subdivision (d), enumerating factors courts must consider in determining whether a defendant is a major participant under the totality of the circumstances:  "What role did the defendant have in planning the criminal enterprise that led to one or more deaths?  What role did the defendant have in supplying or using lethal weapons?  What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants?  Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death?  What did the defendant do after lethal force was used?" (*Banks, supra*, 61 Cal.4th at p. 803, fn. omitted; accord, *Clark, supra*, 63 Cal.4th at p. 611.)

In *Clark* and *Scoggins*, the Supreme Court specified the relevant factors in determining whether a defendant acted with reckless indifference to human life under the totality of the circumstances:  "Did the defendant use or know that a gun would be used during the felony?  How many weapons were ultimately used?  Was the defendant physically present at the crime?  Did he or she have the opportunity to restrain the crime or aid the

18

victim?  What was the duration of the interaction between the perpetrators of the felony and the victims?  What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force?  What efforts did the defendant make to minimize the risks of violence during the felony?"  (*Scoggins, supra*, 9 Cal.5th at p. 677; accord, *Clark, supra*, 63 Cal.4th at pp. 618-622.)  For both the major participant factors and the reckless indifference factors, "'"[n]o one of these considerations is necessary, nor is any one of them necessarily sufficient."'"  (*Scoggins*, at p. 677; accord, *Banks, supra*, 61 Cal.4th at p. 803.)

As the *Scoggins* court explained, "Reckless indifference to human life is 'implicit in knowingly engaging in criminal activities known to carry a grave risk of death.'"  (*Scoggins, supra*, 9 Cal.5th at p. 676; accord, *Banks, supra*, 61 Cal.4th at p. 808 ["[a]wareness of no more than the foreseeable risk of death inherent in any [violent felony] is insufficient"; reckless indifference to human life requires "knowingly creating a '*grave risk of death*'" (Italics added.)].)  "Reckless indifference 'encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions.'"  (*Scoggins*, at pp. 676-677, quoting *Clark, supra*, 63 Cal.4th at p. 617.)  "Reckless indifference to human life has a subjective and an objective element.  [Citation.]  As to the subjective element, '[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create.'  [Citations.]  As to the objective element, "'[t]he risk [of death] must be of such a nature and

19

degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.'"' (*Scoggins*, at p. 677; accord, *Clark*, at p. 617.)

"In addition, 'a defendant's youth is a relevant factor in determining whether the defendant acted with reckless indifference to human life.'" (*People v. Ramirez* (2021) 71 Cal.App.5th 970, 987 (*Ramirez*); accord, *People v. Keel* (2022) 84 Cal.App.5th 546, 558-559 (*Keel*); *In re Moore* (2021) 68 Cal.App.5th 434, 454; see *People v. Oliver* (2023) 90 Cal.App.5th 466, 487-488 ["'[I]n addition to the *Banks* and *Clark* factors, a defendant's youthful age must be considered' when determining whether a defendant 'was a major participant and acted with reckless indifference to human life based on the *totality* of the circumstances.'"].)

"A juvenile's immaturity and failure to appreciate the risks and consequences of his or her actions bear directly on the question whether the juvenile is subjectively '"aware of and willingly involved in the violent manner in which the particular offense is committed"' and has 'consciously disregard[ed] "the significant risk of death his or her actions create."'" (*Ramirez, supra*, 71 Cal.App.5th at pp. 991, 993 [reversing order denying resentencing petition where the petitioner's age (15 years old) at the time of the crime "may well have affected his calculation of the risk of death posed by using the firearm in a carjacking, as well as his willingness to abandon the crime"]; accord, *People v. Jones* (2022) 86 Cal.App.5th 1076, 1092-1093 [vacating order denying resentencing petition following evidentiary hearing and remanding for consideration of defendant's youth (20 years old) at

20

the time of shooting]; *Keel, supra*, 84 Cal.App.5th at p. 562 [reversing order denying resentencing petition, finding petitioner's youth (15 years old) at the time of the shooting "'greatly diminishes any inference he acted with reckless disregard for human life' during the armed robbery" including evidence suggesting his youth "rendered him especially vulnerable to outside pressures"]; *In re Moore, supra*, 68 Cal.App.5th at p. 453 [vacating robbery-murder special-circumstance finding, explaining that even if the *Clark* factors supported a finding of reckless indifference for an adult, the then-16-year-old petitioner lacked ""'the experience, perspective, and judgment"" to adequately appreciate the risk of death posed by his criminal activities"].)

C.    *Substantial Evidence Supports the Superior Court's Finding Jones Was a Major Participant and Acted with Reckless Indifference to Human Life[14]*

Substantial evidence supports the superior court's finding Jones was a major participant under the *Banks/Clark* factors. Jones played a role in planning the burglary.  He told the police

---

[14]    The People contend the superior court properly denied Jones's petition based on a theory of implied malice murder. "Murder is committed with implied malice when 'the killing is proximately caused by "'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.'"'" (*Reyes, supra*, 14 Cal.5th at p. 988.)  We need not reach this argument because we affirm based on the court's finding Jones was a major participant who acted with reckless indifference to human life under the *Banks/Clark* factors.

he went to Allen's house with McClain and Randall to commit the burglary. Further, the men waited until Jovita left Allen's house before they entered through the kitchen window. Even if Jones was not the one who brought the crowbar to the house, given that the three men entered the house together, Jones would have known Randall or McClain brought the crowbar into the house. Although there is no evidence Jones was aware of McClain's or Randall's propensity for violence, Jones was aware of the dangers posed by the burglary because he knew someone was at home, and the crowbar could be used as a weapon. Most significantly, Jones was in the home when either Randall or McClain struck Allen at least 10 times with the crowbar. Jones told the police he heard pounding sounds in the bedroom, and he admitted he knew the person who was present in the home was beaten. Yet Jones did nothing to stop the beating or to assist Allen before leaving the house.

Substantial evidence similarly supports the superior court's finding Jones acted with reckless indifference to human life under the *Clark/Scoggins* factors. As discussed, Jones was aware the murder weapon was brought into the home (the crowbar), he was physically present at the scene (at least in the living room), and the commission of the burglary and beating lasted long enough for the men to cut the electrical cords from two kitchen appliances and ransack the house. Allen was struck on the right side of her head with the crowbar at least 10 times while she was in bed, splattering blood on her bed, bookcase, chest of drawers, and window frame and blinds, and the killer left blood "all over" the hallway walls. Jones acknowledged he heard the pounding sounds and knew a beating was taking place, and given how small Allen's house was, it was a reasonable

22

inference Jones would have seen the blood on the hallway walls from the living room, alerting him to the violence going on in the bedroom.  Yet he made no effort to minimize the risks of violence during the burglary.  Jones could have stepped in to stop Randall or McClain from beating Allen or, as the superior court found, restrained and blindfolded her to prevent her from identifying the men while they searched her bedroom for valuables (avoiding the need to kill her).

Jones's failure to stop the beating or to provide aid to Allen shows reckless indifference to human life.  (See *People v. Montanez* (2023) 91 Cal.App.5th 245, 282-283 [petitioner's failure to aid victims after hearing gunshot supported finding of reckless indifference]; *People v. Nieber* (2022) 82 Cal.App.5th 458, 479 [petitioner showed reckless indifference where "he did not intervene to prevent the murder" or provide "aid at the scene to the murder victim, whom intruders left lying facedown in a pool of blood"]; *In re Loza* (2017) 10 Cal.App.5th 38, 53-54 [petitioner displayed reckless indifference where he "neither intervened to dissuade [accomplice] from shooting either clerk nor came to either clerk's aid after the shootings"].)

Jones contends the superior court did not adequately consider his youth in finding he acted with reckless indifference to human life.  The superior court did not err.  At the time of the killing, Jones and McClain were both 20 years old; Randall was 17 years old.  In making its findings, the court acknowledged youth was a relevant factor, but it noted Jones was older than Randall, who was a juvenile.  Jones argues the fact Randall is three years younger is irrelevant to whether Jones possessed the requisite culpable mental state in light of his youth.  But the court properly considered Randall's age in evaluating whether

Jones's youth made him vulnerable to peer pressure. (See *Keel, supra*, 84 Cal.App.5th at p. 562 [then-15-year-old petitioner "would have felt pressure to 'hit the block' and go along with the robbery instigated by Bolton—a fellow gang associate who was three years [his] senior"]; *Ramirez, supra*, 71 Cal.App.5th at p. 991 [then-15-year-old petitioner's youth made him susceptible to peer pressure from an older gang member].)

Jones also argues McClain "appears to have been the boss of the operation." But Jones was found guilty of three other burglaries not involving McClain that occurred in November 1989 and January 1990—after Allen's murder—suggesting Jones was not influenced by peer pressure from McClain to participate in the Allen burglary. Jones does not point to any other evidence showing his youth and immaturity affected his ability to appreciate the risks posed by commission of a burglary using a crowbar where an occupant was in the home during the crime.

D.    *Substantial Evidence Supports the Superior Court's Finding McClain Acted with Reckless Indifference to Human Life*

Substantial evidence likewise supports the superior court's finding McClain acted with reckless indifference to human life under the *Clark/Scoggins* factors.[15] Although there is no evidence McClain knew of Jones's or Randall's propensity for violence, McClain admitted to police that the three men entered Allen's house with a tire iron (the crowbar) to commit a burglary. And McClain admitted at the evidentiary hearing that he heard

---

[15]    McClain concedes substantial evidence supports the superior court's finding he was a major participant in the burglary of Allen.

24

Jones say during the burglary that someone was home. Yet McClain made no effort to minimize the risk of violence. As the superior court observed, McClain could have minimized the risk of harm to 80-year-old Allen by tying her up and blindfolding her to keep her from identifying the men.

Substantial evidence also supports the finding McClain was present in the home while the beating took place. Although McClain denied going into Allen's bedroom, claiming he simply ran out with the VCR once he learned someone was home, the superior court found his testimony was not credible. The superior court reasonably inferred McClain entered Allen's bedroom in search of valuables because that is where "watches and jewelry and items that have value are kept."[16] Even assuming McClain was in the living room when the beating occurred, the court reasonably inferred McClain heard the pounding noises coming from the bedroom given the small size of the bungalow and that the living room was connected to Allen's bedroom by a tiny hallway (with bloodstains on it). McClain did nothing to stop the beating or render aid to Allen, demonstrating reckless indifference to human life. (See *People v. Montanez, supra*, 91 Cal.App.5th at pp. 282-283; *People v. Nieber, supra,*

---

[16] McClain's attorney asserted at oral argument that McClain consistently claimed he did not learn someone was at home until after he was inside the house. Although we agree McClain was inside the house when he heard Jones say someone was home, it is a reasonable reading of McClain's statement to Officer Wren that McClain learned this just after entering the home (that is, in the kitchen), which is inconsistent with his testimony at the evidentiary hearing that he already had taken the VCR by the time he heard this, and he fled.

82 Cal.App.5th at p. 479; *In re Loza, supra*, 10 Cal.App.5th at pp. 53-54.)

As to McClain's youth, like Jones, McClain was 20 years old at the time of the burglary and murder. There is no evidence McClain was pressured by 20-year-old Jones or 17-year-old Randall to burglarize Allen's house. And McClain admitted at the evidentiary hearing that he was involved in a series of burglaries he committed on his own. The record is bereft of any evidence McClain's youth made him vulnerable to peer pressure or affected his understanding of the risk of death posed by the use of a crowbar during a burglary of an occupied home.

## DISPOSITION

The orders denying Jones's and McClain's petitions for resentencing are affirmed.

FEUER, J.

We concur:


SEGAL, Acting P. J.


MARTINEZ, J.

26